## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Aurelio Montano,

          Plaintiff,

v.

Ghaliah Obaisi, as Independent Executor
of the Estate of Saleh Obaisi, et al.,

          Defendants.

No. 19 CV 2564

Honorable Nancy L. Maldonado

### Memorandum Opinion And Order

Plaintiff Aurelio Montano filed this lawsuit pursuant to 42 U.S.C. § 1983, alleging that Defendants Dr. Saleh Obaisi, Dr. Hector Garcia, Dr. Christian Okezie, and Wexford Health Sources, Inc. ("Wexford"), violated the Eighth Amendment by being deliberately indifferent to his serious medical needs when they delayed the diagnosis and treatment of his prostate and hernia conditions. Defendants filed a partial motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that Montano failed to exhaust his administrative remedies as to his complaints about the hernia and Wexford's policies. For the reasons that follow, the Court finds that Montano exhausted his administrative remedies, and therefore denies Defendants' partial motion for summary judgment (Dkt. 68.)

### Background[1]

Unless otherwise noted below, the facts discussed here are undisputed. Plaintiff Aurelio Montano is an inmate in the custody of the Illinois Department of Corrections ("IDOC"), confined at Stateville Correctional Center ("Stateville"). (Dkt. 74 ¶ 1.)[2] Defendant Wexford is a company

---

[1] In citations to the record, page numbers are taken from CM/ECF headers.

[2] The document at Docket 74 is Plaintiff's Response to Defendants' Statement of Material Facts, which contains

that provides medical services to inmates at Stateville pursuant to its contract with IDOC. (*Id.* ¶ 2.) Wexford employed Defendant Dr. Obaisi as the Medical Director of Stateville until Dr. Obaisi's death in December 2017. (*Id.* ¶ 3.)[3] Wexford subsequently employed Defendant Dr. Okezie as the Medical Director of Stateville and Defendant Dr. Garcia as a physician responsible for participating in collegial reviews to evaluate the appropriateness of sending inmates offsite for medical treatment. (*Id.* ¶¶ 4–5.)

Because Defendants' partial motion for summary judgment is based on Montano's failure to exhaust administrative remedies, and not the merits of his underlying claims, the parties' Local Rule 56.1 statements focus on the facts surrounding Montano's grievances, not his underlying condition or course of treatment. The Court will therefore first provide a summary of Montano's treatment history as presented in his operative Amended Complaint as context, before turning to the record of material facts surrounding Montano's grievances related to his treatment.

### A.  Background on Montano's condition and treatment.

Montano alleges that on or about June 29, 2016, he had difficulty urinating and experienced burning and an associated odor during urination. (Dkt. 43 ¶ 11.) A nurse who saw Montano treated him with Ibuprofen and instructed him to drink at least eight cups of water daily. (*Id.*) Two days later, on July 1, 2016, Montano was seen by a physician on duty, again for difficulty urinating and a poor urine stream. (*Id.* ¶ 12.) A physical exam indicated that Montano had an enlarged prostate and symptoms of benign prostatic hyperplasia ("BPH"). (*Id.*) Montano was prescribed Flomax and Ciprofloxacin. (*Id.*)

---

both Defendants' statements of fact and Plaintiff's responses, as required by Northern District of Illinois Local Rule 56.1(e)(1).

[3] Montano disputes the portion of Defendants' statement of material facts stating that Dr. Obaisi "expired" in December 2017, due to the ambiguity of the term "expired." (Dkt. 74 ¶ 3.) The Court understands "expired" to mean "died," and does not consider the fact of Dr. Obaisi's death in December 2017 genuinely to be in dispute. (See Dkt. 43 ¶ 7) (Amended Complaint stating that Dr. Obaisi was the Medical Director of Stateville "until his passing in December 2017").

The next month, on August 25, 2016, Montano reported that his prostate remained a problem, so he was seen by a nurse and his Flomax dosage was increased. (*Id.*) The medication, however, did not relieve the symptoms, and Montano continued to have urinary complaints. (*Id.* ¶ 16.) Montano was seen multiple more times, and he continued to be treated as if he had a urinary tract infection, despite the fact that his symptoms had previously been noted as BPH. (*Id.*) On November 14, 2016, a physician's assistant saw Montano for strong-smelling urine; Montano's medications were continued and he was told to drink more water. (*Id.* ¶ 17.)

For more than a year, during which Montano had appointments with nurses and Dr. Obaisi, Montano alleges that he was prescribed various medications that did not relieve his symptoms. (*Id.* ¶¶ 16–24.) He continued to complain of difficulty urinating, frequency of urination during the night, burning, and pain, and at one point had to have his bladder emptied by catheter. (*Id.*) Then, on September 18, 2017, Dr. Obaisi saw Montano and again noted the BPH symptoms, and again prescribed Flomax. (*Id.* ¶ 26.) The next month, on October 30, 2017, Dr. Obaisi saw Montano again and noted that the Flomax was not working to help Montano's BPH with obstruction, and he prescribed another medication. (*Id.* ¶ 27.)

On December 11, 2017, nearly a year and a half after Montano first reported his symptoms, Dr. Obaisi noted that Montano had frequent urination at night, a weak stream, dribbling, and BPH with obstruction, and requested a urology referral to the University of Illinois Hospital & Health Science System ("UIC"). (*Id.* ¶ 28.) The referral request was approved on December 20, 2017. (*Id.* ¶ 29.) On March 28, 2018, Dr. Vigneswaran at UIC saw Montano. (*Id.* ¶¶ 30–32.) But between the December 20 approval of the referral and the March 28 appointment at UIC, prison medical staff saw Montano multiple times, because Montano was urinating 20 times per day and was experiencing a low stream, a worsened condition, an abnormal prostate exam, a urinary

3

obstruction, and severe pain and distress. (*Id.* ¶¶ 30–32.)

At the appointment at UIC on March 28, 2018, Dr. Vigneswaran scheduled a return for a cystoscopy[4] in three weeks and referred Montano to surgery for a left inguinal hernia. (*Id.* ¶ 33.) In April 2018, Drs. Garcia and Okezie performed a collegial review and approved the cystoscopy but denied the referral for hernia surgery. (*Id.* ¶ 35.) The cystoscopy was performed in late April 2018, and the findings were consistent with BPH with enlargement and significant bladder obstruction. (*Id.* ¶ 36.) A procedure called transurethral resection of the prostate ("TURP") was then recommended, approved, and subsequently completed on May 18, 2018, nearly two years after Montano's symptoms were first detected. (*Id.* ¶¶ 36–37, 66.) Also on May 18, 2018, doctors again noted the presence of an inguinal hernia was noted. (*Id.* ¶ 38.)[5]

The next month, on June 6, 2018, Montano saw the physician on duty for a hernia evaluation, and later that month Montano again complained of pain in the hernia site and groin, identifying the pain as 10 out of 10. (*Id.* ¶ 40.) On July 2, 2018, Montano again complained of painful urination, and despite Montano's continuing complaints of groin pain, prison medical staff continued with pain medication instead of surgery. (*Id.* ¶ 42.) On October 17, 2018, Montano was again seen at UIC and again recommended for an evaluation by a general surgeon for the left inguinal hernia, but Drs. Garcia and Okezie denied this second request. (*Id.* ¶ 43.) The referral for an evaluation by a general surgeon was ultimately approved, however, and on December 10, 2018, Montano was seen at UIC, where lap robotic hernia surgery was recommended. (*Id.* ¶ 48.) That surgery was approved and ultimately completed on March 15, 2019. (*Id.* ¶ 50.)

---

[4] A cystoscopy is a procedure where a doctor inserts a scope to examine the lining of the bladder and urethra. *See generally Cystoscopy*, Mayo Clinic, available at https://www.mayoclinic.org/tests-procedures/cystoscopy/about/pac-20393694 (last accessed June 10, 2024).

[5] The Amended Complaint states that the cystoscopy "was performed in late April of 2020," but "2020" appears to be a typographical error, because the cystoscopy allegedly preceded the TURP, which occurred in May of 2018.

**B. Montano's grievances related to his medical treatment.**

The Court will now turn to the factual record related to Montano's grievances. Between September 5, 2016, and October 25, 2017, Montano filed six IDOC Offender's Grievances raising complaints about his medical treatment. (Dkt. 74 ¶¶ 7–8, 12, 16, 20, 24, 26.) The Court will summarize the grievances below.

Montano's first three grievances were filed close together in the fall of 2016 on September 5, October 3, and October 18, 2016. In the September 5, 2016 grievance, Montano stated that he had been complaining to medical staff for the past six months about prostate and kidney problems causing pain, but they had not addressed his concern. (Dkt. 74 ¶ 8; Dkt. 69-2.) In particular, Montano claimed that a physician's assistant[6] had prescribed him medication that did not address his pain and refused to schedule him for a follow-up physical. (*Id.*) Montano's October 3, 2016 grievance is similar; he noted that he had started complaining about six months earlier about serious pain and issues with his prostate and kidneys but that medical staff had only been prescribing pills that did not address his problems. (Dkt. 74 ¶ 12; Dkt. 69-5.) Montano further noted that he had attempted to explain to medical staff, including Dr. Obaisi, that his issues were serious and required follow up, but that he had "no idea" whether they were planning to address his concerns. (*See id.*) Then, on October 18, 2016, Montano submitted another short grievance that repeated his complaints that his prostate and kidney issues were not being addressed, that medical staff had simply prescribed him pills that were not addressing his pain, and that he needed a whole new complete physical. (Dkt. 74 ¶ 16; Dkt. 69-8.)

---

[6] Montano's first three grievances identify this individual as a doctor, but his later grievances discussed below clarify that she is actually a physician's assistant. Montano named this assistant in his original complaint, but later dropped her from his Amended Complaint. As the assistant is not a party, the Court has avoided naming her.

Montano filed his next relevant grievance nearly a year later on September 22, 2017. In the grievance, Montano repeated his prior complaint that he had been suffering from prostate issues that were not being addressed, and stated that the physician's assistant had prescribed medication that had to be discontinued due to causing an allergic reaction. (Dkt. 74 ¶ 20; Dkt. 69-11.) Montano went on to state that the assistant agreed with him that the medication should be discontinued, but that when Montano subsequently saw Dr. Obaisi, he prescribed the same medications over Montano's objection that he had a prior bad reaction to those particular prescriptions. (*Id.*) Montano asserted in the grievance that Dr. Obaisi was showing deliberate indifference to his medical needs by attempting to continue improper medication, while his underlying prostate issues and pain were going unaddressed. Montano requested that a doctor fully examine and diagnosis his issues and address his prostate problems. (*Id.*)

Montano then filed two final grievances on October 25, 2017. The first, Grievance No. 395, was targeted at the physician's assistant who is not a defendant to this action; Montano stated in the grievance that he was continuing to experience "excruciating pain when attempting to urinate" that was not being addressed, and that the assistant was deliberately indifferent to his serious medical needs, "namely [his] prostate issue," by prescribing "wholly ineffective" medication. (Dkt. 74 ¶ 24; Dkt. 69-14.) Montano requested "[p]roper Medical Treatment, a proper diagnosis and prognosis as current prescriptions have zero efficacy," and that he receive a consultation with an outside specialist. (*Id.*) The second grievance, No. 396, raised essentially an identical complaint against Dr. Obaisi; Montano stated that Obaisi was being deliberately indifferent to his serious medical needs, "namely a prostate issue," and that Montano has been in "severe excruciating pain when attempting to urinate," but that the medication prescribed by Dr. Obaisi "has no effect." (Dkt. 74 ¶ 26; Dkt. 69-15.) Montano went on to state that Dr. Obaisi was

6

aware of Montano's complaints but had done nothing to diagnose his issues or provide proper medical care or facilitate a visit with an outside specialist, which Montano claimed was necessary because "Dr. Obaisi admits that he has very little to no knowledge of how to treat a prostate issue." (*Id.*) Montano therefore repeated his request for proper medical care and a "proper diagnosis and prognosis as current prescriptions are [of] zero efficacy," and again requested a referral to an outside specialist. (*Id.*)

Montano's grievances were all forwarded to grievance officers for review and investigation, and each was ultimately rejected with no recommendation for further action, as the grievance officers generally concluded that Montano was receiving medical care for his prostate complaints. (*See generally* Dkt. 74 ¶¶ 11, 14, 19, 22, 28, 29.) Montano appealed some of the denials of his grievances to the relevant IDOC officials, but his appeals were rejected. (*See id.* ¶¶ 15, 23, 30.)[7]

### C. Procedural history

Montano initiated the action on April 16, 2019. (Dkt. 1.) The Court subsequently screened the initial complaint, found that it stated a valid claim, and appointed counsel to represent Montano. (Dkt. 8.) Montano, through counsel eventually filed the operative Amended Complaint on October 30, 2022. (Dkt. 43.) Count I of the Amended Complaint asserts claims under § 1983 against the individual Defendants Drs. Obaisi, Garcia, and Okezie, for deliberate indifference to a serious medical condition in violation of the Eighth Amendment. (*Id.* ¶¶ 70–74.) Count II asserts claims under § 1983 against Wexford, also for deliberate indifference to a serious medical condition in violation of the Eighth Amendment, based on its alleged policies and procedures of delaying outside treatment. (*Id.* ¶¶ 75–80.) The crux of Montano's allegations against Wexford is that its

---

[7] The details of the grievance officers' investigations of the grievances, and Montano's subsequent appeals, are not relevant to the instant motion.

policies and procedures prevented Drs. Obaisi, Garcia, and Okezie from referring Montano to an outside specialist and for surgery. (*Id.* ¶¶ 65, 79.) Montano further alleges that Defendants' delay of securing outside treatment resulted in a nearly two-year lapse between the detection of Montano's BPH symptoms, and the eventual TURP treatment he received, and a nearly one-year delay between the diagnosis of the inguinal hernia and his eventual hernia surgery. (*Id.* ¶¶ 66–69.) Montano alleges that Wexford's policies or procedures resulted in "substantial delay in approving, scheduling, and providing outside treatment," by "interfer[ing] with [Wexford] physicians' independent and clinical judgment," such that the physicians "lack the decision[-]making authority to order medical tests and procedures." (*Id.* ¶¶ 60, 61, 63, 78.) These delays allegedly "caused Mr. Montano needless pain and suffering." (*Id.* ¶ 67.)

After the initial pleading stage, the case was referred to the assigned magistrate judge for discovery supervision. (Dkt. 59.) After engaging in an initial phase of written discovery and exchange of documents, Defendants indicated that they intended to file a motion for summary judgment on exhaustion grounds, and objected to any further discovery until their motion was resolved. (Dkt. 63.) Defendants subsequently filed their motion for partial summary judgment, (Dkt. 68), and the magistrate judge stayed further discovery into the merits of Montano's claims pending this Court's resolution of the exhaustion issue. (Dkt. 72.)

## Legal Standards

### A.  Summary Judgment

On summary judgment, the Court must view the record in the light most favorable to the non-moving party and grant the motion if the movant "show[s] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021); Fed. R. Civ. P. 56(a). Summary judgment is warranted "against

a party who fails to make a showing sufficient to establish the existence of an element that is essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of showing the grounds for their motion. *Id.* at 323. Once they have, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is genuine when a reasonable jury could return a verdict in favor of the non-moving party. *Id.* The Court must construe all facts in the light most favorable to the nonmoving party and draw all legitimate inferences in favor of that party. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). "A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id.*

### B. Exhaustion of Administrative Remedies Under the Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") provides that a prisoner may not bring a lawsuit about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a). "The exhaustion requirement is an affirmative defense, which the defendants bear the burden of proving." *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011). For a prisoner to properly exhaust his administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).

An IDOC inmate must follow the grievance process set out in the Illinois Administrative Code. 20 Ill. Admin. Code § 504.800 *et seq*. This process requires that grievances "contain factual details regarding each aspect of the [inmate's] complaint, including what happened, when, where

and the name of each person who is the subject of or who is otherwise involved in the complaint." § 504.810(c). When an inmate does not know the identities of those involved in the complaint, he "must include as much descriptive information about the individual[s] as possible." *Id.*

The purpose of requiring prisoners to first exhaust the grievance process is to provide prison officials " a fair opportunity" to address an inmate's complaints. *See Maddox v. Love*, 655 F.3d 709, 713 (7th Cir.2011). "Indeed, the Seventh Circuit has consistently reminded district courts that 'all the PLRA requires' is that a grievance 'alert the prison to the nature of the wrong for which redress is sought,' and afford prison officials an opportunity to respond." *Conley v. Birch*, No. 11-CV-0013-MJR-SCW, 2012 WL 4202702, at *4 (S.D. Ill. Sept. 19, 2012) (citations omitted)). Thus, the exhaustion requirement "serve[s] its function" if it provides "prison officials a fair opportunity to address [a prisoner's] complaint." *Maddox*, 655 F.3d at 713 (7th Cir. 2011); *Hacker v. Dart*, 62 F.4th 1073, 1084 (7th Cir. 2023); *see also Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004) ("We are mindful that the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation.").

## Discussion

Defendants have moved for partial summary judgment, arguing that Montano failed to administratively exhaust his claims as required under the PLRA with respect to: (1) the individual Defendants' alleged deliberate indifference to his hernia; and (2) Wexford's alleged deliberate indifference based on its policies and practices for reviewing and approving outside treatment. Defendants otherwise concede that Montano successfully exhausted his administrative remedies with respect to his claims that Dr. Obaisi was deliberately indifferent to his prostate condition.[8]

---

[8] Defendants initially did not seek summary judgment regarding Dr. Obaisi's alleged deliberate indifference to Montano's hernia, because they construed the operative Amended Complaint as not directing any claim based on the

The Court will address each contested exhaustion issue below. Ultimately, the Court concludes that Montano properly exhausted his claims, and that Defendants' motion for partial summary judgment should therefore be denied.[9]

### A. Montano exhausted his claims as to his hernia treatment.

Defendants argue that Montano failed to exhaust his administrative remedies as to the treatment for his inguinal hernia, because Montano's last relevant grievances filed in October 2017 mentioned only his prostate issues, not the hernia, which was not noted in the medical records until March 2018 when Montano received an off-site evaluation at UIC. Defendants contend that the symptoms for the prostate condition are different from the hernia condition, making these two separate and distinct medical issues requiring separate grievances, and that Montano's six grievances between 2016 and 2017 would not have alerted prison staff to any inadequate medical care for the hernia condition.

In response, Montano argues that the grievances did put prison and medical staff on notice of Montano's severe symptoms and his demand for a proper diagnosis and outside treatment, and that the hernia does fall within the scope of those grievances. Montano contends, citing to various medical sources, that there is a well-established link between the symptoms about which he was complaining in his grievances—severe excruciating pain while attempting to urinate—and the possibility of a hernia. Montano asserts that he was not required to have diagnosed his own hernia

---

hernia at Dr. Obaisi. (*See* Dkt. 68 at 1 n.1.) Montano clarified in his response brief, however, that he was indeed alleging that Dr. Obaisi was deliberately indifferent to both his prostate and hernia issues. (Dkt. 73 at 1–2.) Thereafter, Defendants took the position that they were also entitled to summary judgment on the deliberate indifference claim against Dr. Obaisi related to the hernia on exhaustion grounds. (Dkt. 77 at 1 n.1.) In light of Defendants' position, the Court granted Montano leave to file a sur-reply. (Dkt. 80.)

[9] Neither party has requested a *Pavey* hearing. (*See* Dkt. 68 at 10 n.4); *see generally Pavey v. Conley*, 544 F.3d 739, 740–41 (7th Cir. 2008). In any event, the Court agrees that an evidentiary hearing is not needed in these circumstances, given that the parties do not dispute any material facts with respect to the timing or universe of relevant grievances. *See Byrd v. Fagerland*, No. 12-CV-1018-MJR-SCW, 2013 WL 6645400, at *3 (S.D. Ill. Dec. 17, 2013) ("Because . . . there are no disputes of fact over exhaustion, the Court finds that a Pavey hearing is not necessary since the issues presented are solely legal questions."). Rather, as will be seen below, the parties' arguments turn solely on adequacy of notice provided by the grievances based on their undisputed contents. A hearing is thus unnecessary.

to mention it specifically in his grievance, nor was he required to file a successive repeat grievance once he was finally diagnosed with a hernia in March 2018. Rather, all he was required to do was put the prison on notice of his severe urinary and groin issues and his complaint that he was not receiving treatment for those issues. Montano argues his grievances provided that notice, including his specific complaint that he was not receiving a proper diagnosis or examination from a specialist, and that Defendants cannot now hide behind their own failure to provide follow up examinations by specialists to claim they were not on notice of Montano's specific condition of a hernia.

In their reply, Defendants contend that an inguinal hernia is a large and painful bump in the groin, and they therefore argue that Montano "did not have to be a doctor to observe this condition and include it in his" grievances. (Dkt. 77 at 4.) Defendants further argue that Montano cannot rely on inadmissible medical sources to attempt to tie his hernia to his earlier urinary symptoms complained of in his grievance, and that there is simply no evidence that Montano was suffering from a hernia at the time of his October 2017 grievances. In other words, the prison could not have been on notice of the issue prior to when it was diagnosed in March 2018.

The Court concludes that Montano successfully exhausted his claims with respect to the treatment of his hernia. Montano's grievances indicate that he had been consistently complaining to medical staff, including Dr. Obaisi, about pain in his kidneys and prostate, and that he was suffering from "excruciating pain when attempting to urinate," but that medical staff refused to address his concerns or his requests for an outside evaluation, and instead simply prescribed him ineffective pain medication. Recall that the PLRA simply requires that a grievance "'alert the prison to the nature of the wrong for which redress is sought,' and afford prison officials an opportunity to respond." *See Conley*, 2012 WL 4202702, at *4 (quoting *Westefer v. Snyder*, 422

12

F.3d 570, 580 (7th Cir.2005)). While Montano's grievances do not use the specific word "hernia," the prison (and medical staff) were plainly alerted by Montano's six grievances over the course of a year that he was enduring ongoing pain in his pelvic region, including painful urination, associated with a number of potential issues, and that he was specifically asking for an outside specialist to identify the source (or sources) of that pain and provide proper treatment. That Montano was not yet aware of the full scope of his medical conditions and diagnosis of a hernia, through no fault of his own, does not mean that the prison was not on notice of his claims that he was not being properly treated. They plainly were, and Defendants cannot escape liability simply by the fact that Montano did not identify his precise medical condition causing his pain in his many grievances about inadequate treatment.

Indeed, as Montano points out in his briefing, part of the basis of his grievances was his complaint that he was not receiving a proper diagnosis in the first place, because medical staff, including Dr. Obaisi, were refusing to refer him to a specialist. (*See, e.g.*, Dkt. 69-15) (requesting "[p]roper Medical Treatment, a proper diagnosis and prognosis as current prescriptions are zero efficacy and a Consult with a Specialist at UIC or St. Josephs or other outside hospital."). It would be an absurd result to say that Defendants can escape liability on exhaustion grounds based on Montano's failure to name his specific condition, when Montano was complaining that prison staff were denying him a referral to a specialist to determine *what his condition was*. To accept Defendants' argument would allow medical providers at correctional institutions to use an improper diagnosis to avoid liability for that improper diagnosis, instead putting the burden on inmates to properly diagnose themselves. Defendants seem to expressly argue as much in their briefing, claiming in conclusory fashion that Montano should have noticed his hernia and mentioned it in his grievances. But the Court will not endorse Defendants' expansive reading of

13

the requirements of the PLRA and their attempt to place the burden on prisoners to self-diagnose and anticipate every potential medical condition or diagnosis that may be implicated by their symptoms of pain. Montano was merely required to alert the prison to his complaints of inadequate treatment, which he did. And Montano was not required to file a new grievance after receiving his proper diagnosis. *See, e.g.*, *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) ("Separate complaints about particular incidents are only required if the underlying facts or the complaints are different."). Montano was not required to file a new grievance because his underlying complaints about lack of adequate treatment were the same; all that had changed after March 2018 was that he now had the additional information that he was suffering from a hernia.

In short, the Court concludes that Montano's grievances, including his final two grievances in October 2017, sufficiently exhausted his claims for lack of treatment as to both his hernia and his prostate condition.[10]

### B. Montano exhausted his claims as to Drs. Garcia and Okezie.

Defendants also argue that, even if the grievances related to the prostate issue encompass the hernia, none of those grievances mention Dr. Garcia or Dr. Okezie, and therefore those individual doctors could not be on notice that Montano found their treatment deficient.

In his response, Montano contends that he was not required to name the specific defendants in his grievance, or file an additional grievance naming them, as long as his other grievances put the prison on notice of his complaints. Further, Montano asserts that he could not have named those individuals in his grievances anyway, because he was not aware at the time of their involvement in the collegial review process that led to the denial of his requests for outside surgery.

---

[10] Because the Court finds that Montano's grievances were sufficient, the Court need not get bogged down in the parties' competing medical evidence and their contentions as to whether the hernia was actually linked to, or potentially caused, the urinary symptoms Montano was complaining about in his grievances.

In reply, Defendants point to the non-precedential Seventh Circuit decision in *Barrow v. Wexford Health Sources, Inc*., which they contend stands for the proposition that Montano cannot use his prior grievances against certain medical providers as a basis for exhausting his claims against different providers who were not yet involved in his treatment at the time of the grievances. (Dkt. 77 at 7) (citing *Barrow v. Wexford Health Sources, Inc.*, 793 F. App'x 420, 423 (7th Cir. 2019)).

The Court concludes that that Montano successfully exhausted his administrative remedies against Drs. Garcia and Okezie. "In order to exhaust their remedies, prisoners need not file multiple, successive grievances raising the same issue . . . if the objectionable condition is continuing." *Turley*, 729 F.3d at 650. Here, Montano's October 2017 grievances put the prison on notice that he was requesting a specialist's proper diagnosis and outside treatment to finally address his extreme and long-continuing pain. When Montano ultimately received a referral to the specialist at UIC in March 2018, that did not resolve the complaints in his grievances, because the specialist recommended a further referral for surgery to address his hernia, which Drs. Garcia and Okezie rejected (multiple times) through the collegial review process. In other words, the same "objectional condition" about which Montano was complaining—the denial of outside treatment by specialists—was continuing when Drs. Garcia and Okezie denied his referral for surgery. Under *Turley*, Montano was not required to file successive grievances complaining about the same issues he had previously complained about, that is, that medical staff were rejecting his requests for outside treatment. *See id.* ("Separate complaints about particular incidents are only required if the underlying facts or the complaints are different."). Instead, the Court finds that Montano's need for the recommended surgery fell within the scope of his prior grievances about medical staff's refusal to refer him for outside treatment.

The Court also credits Montano's argument that he could not have named Drs. Garcia and Okezie anyway, as they did not directly treat Montano, but rather were involved in Wexford's outside collegial review of his treatment. The Court must draw all inferences in Montano's favor as the non-movant, and Defendants have the burden to establish their affirmative defense of exhaustion. Yet Defendants have come forward with no evidence suggesting that Montano would have been aware of Drs. Okezie and Garcia's specific involvement in his treatment decisions. The only reasonable inference at this stage is that Montano did not know, and therefore from his perspective, the multiple denials of his requests for surgery in 2018 were not new and separate incidents, but rather part of the same ongoing issue about which he had already complained. The exhaustion requirement "serve[s] its function" if it provides "prison officials a fair opportunity to address [a prisoner's] complaint," and a grievance need not put specific individuals on notice of potential litigation against them. *Maddox*, 655 F.3d at 713 (noting that "early notice to those who might later be sued" is not the purpose of exhaustion); *Hacker*, 62 F.4th at 1084. A "failure to include named defendants in a grievance is 'a mere technical defect' where the inmate sufficiently describes the alleged wrongdoing to allow prison officials a fair opportunity to respond." *Saffold v. Illinois Dep't of Corr.*, No. 18 C 3301, 2021 WL 4477930, at *7 (N.D. Ill. Sept. 30, 2021*)* (quoting *Donald v. Varga*, No. 17 C 50368, 2019 WL 2525856, at *5 (N.D. Ill. June 19, 2019); *Maddox*, 655 F.3d at 722. Therefore, Drs. Garcia and Okezie did not need to be specifically named in the grievances for the prison (and Wexford) to be on notice that Montano was seeking outside treatment, including any necessary surgery. Rather the prison and Wexford were on notice of his complaints of lack of outside treatment and had the opportunity to respond, but they determined that surgery was unnecessary.

The *Barrow* decision relied on by Defendants does not change the Court's ruling. In *Barrow,* the plaintiff-inmate filed multiple grievances complaining that the prison's medical director was delaying in scheduling cataract surgery, and he subsequently filed suit against Wexford and a different medical director that took over after plaintiff had filed his grievances. 793 Fed. Appx. at 420. The Seventh Circuit, distinguishing *Turley*, held that the prisoner's grievances naming the prior medical director had not exhausted his claims against the defendant medical director that later took over, because the prisoner was not complaining about a "systematic practice," but rather the "specific instances" in which the subsequent provider delayed his treatment. *Id.* As the plaintiff was complaining about specific instances of delays caused by the subsequent provider, he was required to have filed grievances about that specific conduct before suing. *Id.*

As an initial matter, the Court notes that *Barrow* is an unsigned, non-precedential order. It is therefore not binding on this Court and does not set forth any rule contrary to the binding precedent established by *Turley*, which held that multiple successive grievances on the same issue are not required. *See* 7th Cir. R. 32.1(b). The Court could therefore disregard *Barrow* out of hand. But in any event, the Court also finds the decision distinguishable. The *Barrow* court distinguished *Turley* based on the fact that the plaintiff was complaining about separate conduct, not a "systematic practice." 793 Fed. Appx. at 423.  But here, a "systematic practice" is exactly what Montano was complaining about in his grievances: the continuing practice of prison medical staff refusing to refer him to outside specialists for the treatment he needed. Again, there is no evidence that Montano was aware that his requests for treatment were being denied by Drs. Garcia and Okezie through Wexford's collegial review process, and so from his perspective the denial of surgery was part of the same ongoing violation of his rights. The same objectionable conduct was

17

continuing, and under the binding decision of *Turley*, Montano was not required to file a successive grievance to complain about the same issue just because it was being continued by different providers. *See, e.g.*, *Todd v. Shaw*, No. 3:17-CV-359-DRH-DGW, 2018 WL 5904455, at *5 (S.D. Ill. Aug. 27, 2018) (distinguishing *Barrow* and concluding that plaintiff had sufficiently exhausted his claims, stating that "requiring [the plaintiff] to file another grievance each time a new health care provider continued in the ongoing denial of his request for medically necessary meals is contrary the Seventh Circuit's holding in *Turley v. Rednour*, that prisoners do not need to file multiple grievances where a continuing violation exists") *report and recommendation adopted*, No. 17-CV-0359-DRH, 2018 WL 4679961 (S.D. Ill. Sept. 27, 2018).

In short, the Court finds that the October 2017 grievances put the prison on notice of Montano's extreme and continuing pain, which encompassed both the prostate and as-yet-undiagnosed hernia issues, as well as Montano's request for treatment by an outside specialist, which encompassed the later-recommended surgery. Montano was not required to name Drs. Garcia and Okezie in a successive grievance, and Defendants have not carried their burden to show that Montano failed to exhaust his administrative remedies as to the individual Defendants on the hernia issue. Defendants' motion for summary judgment is therefore denied on this issue.

### C. Failure to exhaust as to Wexford's policies.

Finally, Defendants argue that Montano failed to exhaust his claims against Wexford based on its policies and practices for reviewing and approving outside treatment, because none of his grievances mention Wexford or alludes to any of Wexford's policies, practices, or customs. Rather, Defendants argue, the grievances refer only to the decisions of individual members of the medical staff at Stateville and do not even mention Wexford. Defendants contend that the grievances cannot be construed to seek redress regarding systemic or institutional policies regarding offsite care, and therefore Montano's assertions directed at individual members of the medical staff do not alert

prison officials of a policy problem at Wexford.

In response, Montano argues that his grievances did not need to name Wexford specifically or identify a specific Wexford policy in order to achieve exhaustion, because his grievances plainly put prison officials (and Wexford) on notice that he was in pain and not being treated for his medical issues, and that his requests for outside treatment were being ignored.

The Court agrees with Montano and finds that his grievances sufficiently exhausted his claims against Wexford. District courts within the Seventh Circuit have regularly held that a inmate need not specifically name Wexford, or identify a particular Wexford policy, in a grievance in order to exhaust a claim as to Wexford. *See Conley*, 2012 WL 4202702, at *4 (finding that inmate's grievance detailing alleged delays in his treatment "alerted prison administrators to the alleged problem with scheduling medical treatment and procedures . . . and permitted prison administrators (who knew that Wexford was the healthcare contractor for the prison) to examine whether Wexford's policies or practices had caused a delay in [plaintiff's] treatment."); *Williams v. Carter*, No. 12 C 50140, 2012 WIL 4815476, *2 (N.D. Ill. Oct. 10, 2012) ("[W]here the plaintiff is claiming a broad denial of proper treatment by the health care unit as a whole, he will not be found at fault for failing to name Wexford itself. As the provider/employer of Dixon's medical staff, Wexford was presumably in a position to address the plaintiff's concerns about the quality of his medical care."); *Harper v. Henton*, No. 11-CV-406-MJR-SCW, 2012 WL 6595159, at *6 (S.D. Ill. Nov. 30, 2012) ("[plaintiff's grievance] put administrative officials on notice that Plaintiff was grieving about policies or procedures of Wexford as IDOC officials clearly know that Wexford is contracted out for the prison's healthcare and would, more than likely, be the entity responsible for the manpower and financial issues Plaintiff describe[d]"), *report and recommendation adopted*, No. 11-CV-0406-MJR-SCW, 2012 WL 6594954 (S.D. Ill. Dec. 18, 2012). In short, the courts in

these cases agreed that an inmate need not specifically mention Wexford or a particular policy if his grievance was enough to put prison officials (who are obviously aware of Wexford) on notice that a Wexford policy or practice may be implicated.

Here, Montano repeatedly complained that he was receiving ineffective treatment and that multiple providers were denying his requests for referrals to outside specialists to receive a proper diagnosis and treatment for his conditions. The Court finds these grievances sufficient under the PLRA to exhaust his claims against Wexford, because the grievances would have not only alerted prison officials to Montano's complaints about his treatment, but would have "permitted prison administrators (who knew that Wexford was the healthcare contractor for the prison) to examine whether Wexford's policies or practices" were the reason that Montano was not being referred. *See Conley*, 2012 WL 4202702, at *4. Indeed, given the omnipresence of Wexford in the IDOC correctional system, and their consistent involvement in inmate treatment decisions as demonstrated by the plethora of complaints and lawsuits initiated by inmates raising similar claims that Wexford denied outside treatment, it should have been obvious to prison officials that Montano's complaints about denials of outside referrals at least potentially implicated Wexford policies. That notice, and the opportunity to address it, was all that is required under the PLRA.

Defendants counter that *Conley* and the other cases cited by Montano (and the Court above) are inapplicable because Montano was not complaining about systemic issues implicating Wexford policies or practices, but rather he was complaining about the individual treatment decisions of Dr. Obaisi and the physician's assistant who treated him. But the Court has already explained above that Montano was plainly complaining about a continuing and ongoing violation—the denial of outside treatment over the course of at least a year. While his notice may have only specifically mentioned the individual providers, his complaints about denials of outside treatment were enough

to put prison officials on notice to the point where they should have at least examined whether the decisions were driven by individual providers or whether Wexford policies were implicated. *See id.* In short, Montano was not required to specifically tie his complaints in his grievance to a specific Wexford policy or practice in order to grieve it. *Id.* ("Conley was not required to identify specific Wexford policies or grieve specific Wexford practices."). To paraphrase the Court in *Conley*: prisoners' interactions with the prison health care system are limited to the doctors and nurses who treat them, and a prisoner such as Montano may not even know that those providers work on a contract basis for corporations such as Wexford; it would therefore be an odd result to allow a corporate entity like Wexford, which is presumably interacting with the prison regarding health care grievances, to escape liability simply because a prisoner, who may not even know about the connection between his care and Wexford, did not mention the company in a grievance. *See id.* Instead, all that is required is that the grievance serve its purpose of providing prison officials an opportunity to address the prisoner's complaints. Montano's grievances here plainly did that and clearly implicated Wexford itself.

In sum, the Court finds that there is enough indication in Montano's grievances that the inadequate medical treatment went beyond just Dr. Obaisi and was instead potentially a more widespread and continuing problem in the medical department, thereby putting prison officials (and by extension Wexford) on sufficient notice of Montano's complaints. In other words, Defendants have not carried their burden to show that Montano failed to exhaust administrative remedies against Wexford for its policies and procedures. This motion for summary judgment is therefore denied on this ground as well.

21

**Conclusion**

For the foregoing reasons, Defendants' motion for partial summary judgment (Dkt. 68) is denied.

ENTERED:     6/10/24

_____
Nancy L. Maldonado
United States District Court Judge